May it please the court. My name is Eitan Kassel-Janich. I'm representing Dawn Vermeulen in this case. Vermeulen has been unable to perform any type of full-time work since September of 2007, when she was 35 years old. She's currently 46 years old. She has many different impairments, including fibromyalgia, Sjogren's, osteoarthritis, migraines, left shoulder pain. She's had a meniscal repair in her right knee, an ACL repair. She's got a pain disorder with both psychological factors and a general medical condition. She's been diagnosed with an adjustment disorder with mixed anxiety and depressed mood, as well as social phobia. In March of 2012, her treating physician, Dr. Wynn, opined that she, that the combination of her impairments caused many significant functional limitations, and that her fatigue and pain prevented her from performing any type of full-time work activity, even in a sedentary position. But the ALJ rejected her opinion. Now, what I wanted to focus on today is the issue, when a person has fibromyalgia, how does an ALJ know how it limits them? How do any of us know how it limits them? And how does her doctor know how it limits her? And what it always will boil down to is, what does she have to say about the symptoms she's experiencing? Now, a doctor can look at her, can see her, can test her, can do the tender points, which shows that, which has confirmed, and there's no question in this case, that she's been diagnosed with fibromyalgia, and the ALJ found that that was a severe impairment. But the, with regard to how she is limited by it, you need to ask the claimant. Well, Vermeulen described experiencing fatigue. She described variable functionality, where some days would be better than others, and the more active she was, the less active she would be the next day. So she couldn't sustain activity, and this even, this even happened with her last job. She attempted a part-time job that was only 10 hours a week, two five-hour shifts a week, and she couldn't even maintain that because the radiation was so intense. She couldn't even get, she couldn't, she were days she couldn't show up for work. She was in too much pain. How does the fact that it was found by the ALJ that she failed to pursue several types of treatment that were recommended for her, how does that fit in with the finding that her testimony was not credible? Well, the main thing is that with, under SSR 16-3P, but also under just long-standing Ninth Circuit law as well, and you, an ALJ cannot reject a claimant's testimony based on their failure to comply with treatment recommendations without first considering their explanation for why they were not getting additional treatment. The record here shows that she had tried many different medications, and it had adverse side effects to virtually all of them. There was one point where they found a medication that was actually effective, it was working, and her pain decreased. And then several months later, she started having side effects to that as well. That was the Cymbalta. So the record shows... There were other recommendations that I think Judge Toonheim was referring to for non-medical modalities including acupuncture, exercise, I don't remember the other, meditation. There was a range of them. I think Dr. Peck had recommended and then said she was not interested in following up. I know the ALJ considered that as well. At pages 592 and 93 in the record is a handwritten statement from Muellen in which she explains how she lost her medical insurance. They couldn't afford medical insurance, and it limited her ability to obtain treatment for much of the, not all, but significant periods of time throughout the period that's at issue here. And so that inability to afford medical treatment is the reason that she could not follow through on all of those things. But there's also evidence that she attempted the... That's the main evidence here, is that she could not afford it. She couldn't afford additional treatment. Now, she also, as far as exercise, she attempted to exercise. But in fact, that was one of the things that was a body builder. This woman was incredibly strong. And she couldn't do that anymore, had long since stopped that. Well, she decided she would try to start doing that again. She didn't get very far. But the fact that she decided to try to build up her strength again was actually held against her as an example of why she's not credible or why her testimony should be dismissed. I think the ALJ made specific findings that her symptoms were not severe enough to motivate her to seek these other forms of treatment. And that was one of the ALJ's findings that affected her credibility. All these different forms of treatment, which she asked about and specifically declined to do, was evidence that her symptoms weren't severe enough in his view. Well, that's one of the things he found. But he did not consider the fact that she couldn't afford the additional types of modalities of treatment. Well, some of them were better sleep hygiene and relaxation. Those are not costly items, are they? Well, no. But there's no evidence that she didn't try to sleep. I mean, we're not talking about a person that's intentionally not sleeping. She was doing whatever she could to try to like function in her life. Fibromyalgia is not, you know, the thing that was not understood, I think, by the ALJ here is the variability in the symptoms from day to day. And hour to hour. And so it wasn't like she couldn't do anything, but there were a lot of things she could no longer do. One of the things the judge held against her, the ALJ held against her, was that she reported to one psychologist that she would bike and walk. Well, that was an attempt to exercise. But there's no evidence in the record as to how often she did either of those things. And actually the evidence that you do find about walking shows that she did much less walking than she ever used to. But that was the only exercise she could do. So do you think an ALJ could ever make an adverse credibility determination with respect to an individual who claims fibromyalgia? Yes. And what would that require in order to make an adverse credibility determination? It would require the presence of actual evidence that supports their determination. And what would that be? Well, for example, in this case, she would go once a week to her son's sports, baseball and football games, and sit not in the bleacher, she'd usually bring her own chair because she couldn't handle sitting in the bleacher, but she would go there to watch his sporting events. If she were participating, now she used to play softball, she can't do that anymore. If she were playing softball, if she were doing physically active activities and doing them on a regular basis... So you'd have to have an investigator who had some information for every day, because her claim here is that her strength was variable. So I assume even if she had played softball, she would say, well, the next day she would have to rest. She didn't play softball, though. She couldn't play softball anymore. We were just exploring a hypothetical. What would it take for an ALJ to have an adverse credibility determination in your view? And it sounds like there would have to be someone watching her every day to make sure that she was sustaining the same level of activity every day. Well, there's no evidence here that she's sustaining any significant level of activity on a regular basis. There's no observations. There's her testimony... I'm just asking as a hypothetical, what would it take? And is that your view? People... There's an assumption, I think, here, among many ALJs, that the purpose of listening to a person's testimony about their, and not just with fibromyalgia, but about their various problems that they're having, is to try to find something that detracts from the consistency of it. It's sort of a, well, there's this thing here, like there's that one word that says bike, and then that's held against her, when there's no evidence of how often she was actually doing that. So I think what you would need to have is actual, I mean, she's not lying is the thing. She's telling the truth about what she, how she's limited. And if an ALJ is going to assume that she's doing more than that, there's got to be some evidence somewhere that actually shows that. They're not, he's assuming, there's no justification for him to assume that she's lying when she describes the limitations that she has. They're consistent with her diagnoses, which are many. They're consistent with her treatment. They're consistent with her treating physician's opinion that she couldn't handle sedentary work. So, you know, there's got to be evidence, is the idea. An ALJ has got to base his decision on evidence, not on some kind of assumption that I see the word bike in one report once and therefore that shows that she's not as impaired as she claims to be. I have a question about Dr. Peck, who I think is the treating chiropractor. His opinion is not to be given the kind of deference as a treating physician, correct? Isn't he an other source under the regulations? Yes. And his, the thing with his opinion is that he had, chiropractors use their own language. And he had noted in treatment notes, and I cite him in my, I believe in my reply brief, the various treatment notes where he cited findings that support his general idea. But I don't think, you know, his opinion obviously is not entitled to the same level of weight as Dr. Nguyen. If you don't have any more questions for me, I would like to reserve some time for rebuttal. Thank you. Thank you. Good morning, your honors. May it please the court, I'm David Burdett, representing the The questioning of Mr. Yannich's argument got at exactly the purpose for which the Social Security Administration has ALJs, and that is to weigh the evidence. And typically it does come down to evaluating a person's testimony, a claimant's testimony about the extent of their symptoms, and weighing and balancing the medical evidence. Now, it cannot be, and I'm just going to start, Judge Okuda, with your point. It cannot be that every time a person claims fibromyalgia or has a diagnosis of fibromyalgia, that they are automatically disabled and that is the end of the story. We know that's not right. So an ALJ must be able to, by pointing to evidence in the record, make a finding. And if that finding is that the person is not disabled, if the ALJ pointed to some evidence, then that has to stand, or otherwise disability benefits would be available to everybody who claims they have fibromyalgia. Now, the point that Mr. Yannich made, and it is valid, is that, this point is valid, that an ALJ has to base his or her decision on some evidence. The ALJ did that here. The ALJ's purpose is not, as Mr. Yannich suggested, to try to find something that detracts from the person's credibility and build out a decision on that. They don't do that. There are lots and lots of these cases, many hundreds, every ALJ has on find something that detracts from them in every case. Counsel, just to interject a question on that point, what would you say are the chief pieces of evidence that the ALJ relied on in making a negative credibility decision? I think first, Your Honor, the activities that the ALJ cited. And the activities are granted, susceptible to more than one interpretation, but the activities that he cited, and secondly, which was also gotten to in the previous argument and the questioning, the claimant's decision not to pursue various treatment modalities that were recommended. And also, because it's a formally separate issue in the way that we argue it back and forth in court, they're all related. Other medical, pieces of medical evidence, reports from other doctors that suggest that she is not as limited as she asserted at the hearing in her testimony, and as Dr. Nguyen suggested, in March of 2012. So there's three headings there. So which of the other medical records or doctor's statements do you think he relied upon? He certainly relied on Dr. Schroeder, who is a podiatrist, who examined Ms. Vermilion in March of 2012, the same month that Dr. Nguyen examined her, which is the one that they principally want to rely on, same month. Dr. Schroeder said that she reported pain that is mild, and said that she could stand or walk for six hours or more in a work day, and that she had no impairment, quote unquote, no impairment in walking, very contrary to her claims and those of Dr. Nguyen. He relied on, the ALJ relied on another examining physician, Dr. Sapp, who had examined Ms. Vermilion in September of 2011, and also said that she had no limitations, no limitations in standing, walking, and sitting, no limitations in her posture or environment, and that she could lift up to 50 pounds. That is a very, very different report. Those are two very, very different reports from examining physicians than the examination of Dr. Nguyen. So now we're down to what, and there are others. There's the state agency physician. I understand that state agency physicians are, in general, to be given less weight in the hierarchy, but this is backed up by the reports of two examining physicians. Three, in fact, because there was another one that the ALJ didn't rely on, who similarly said she had no lifting limitations. So we're down to the purpose of an ALJ in these proceedings, and the purpose of the ALJ is when there's evidence that goes both ways, and it seems to cut, you know, some evidence cuts in favor of the claim limitations and some evidence cuts against it, the ALJ has to make a finding. We employ ALJs to sort these facts out. So the ALJ looked at the stack of doctor's records over here, and the stack of doctor's claimants' testimony, and looked at other factors that he considered regarding her activities and the treatment modalities, and he came to a determination. And, you know, it simply cannot be that every time a person claims a certain impairment, whether it be fibromyalgia or a stroke, that it's an unfalsifiable claim. That would make adjudication of these hundreds and thousands of Social Security cases simply impossible. The claim has to be falsifiable in some way, and the trier of fact is in the best position to do that. Now, it is not a matter of the claimant's character. There was mention made earlier of, oh, we find that you're lying. No, the word lying is not in the decision. She was, but it is a finding that, you know, the claims that were put forth, and they may be based on an honest self-perception, do not seem correct, do not seem as credible as the conclusion that the ALJ made. And the ALJ is allowed to make that determination. With regard to the issue of whether or not Ms. Remuland's reasons for not taking, making trials of different medications and so forth and the treatment modalities was considered. It was considered. That reasoning was considered. The ALJ considered that at page 293. So that has been thought about, addressed. The ALJ didn't agree with that. To consider an argument is not to embrace the conclusion of the argument that the arguer would prefer. It's been considered. As Judge Akuta and also Judge Tonheim indicated, there were other treatment modalities too that were suggested, like physical therapy, that are not expensive and that don't have the potential side effects that the claimant feared from new medications. Did the claimant ever give a reason in the record why she didn't try those other forms of treatment? I don't think so, but I cannot say with certainty that she never said that in the record. I don't want to put a false statement in her mouth. I think not, but I'm open to correction on that point. And finally, I want to just touch on something that was not yet addressed in the argument, but I think it's important, and then I'll take any questions that the Court may have. There was evidence submitted post-hearing to the Appeals Council, and this was addressed in Mr. Yonch's brief in mind. He submitted evidence post-hearing to the Appeals Council that were a brain and a cervical spine MRI. And we have the case of 2012 that says where the Appeals Council receives that evidence, considers it, makes it part of the record, then the District Court, and then presumably this Court on Appeal, will consider that to see whether or not that evidence deprives the ALJ's decision of substantial evidence support. Because that, of course, is the factual standard that the ALJ has to meet, substantial evidence. I would just say that in the light of the evidence that was submitted to the Appeals Council in this case, still the ALJ's decision had substantial evidence support. Because the brain MRI that was submitted, the doctor said, no abnormalities. The spine MRI, the doctor said, there were some degenerative changes. This is a very common finding. There may be a pinched nerve. This could potentially cause pain and numbness in the arms and hands. The spinal cord looked fine, so there is nothing that explains your leg symptoms and numbness. I think there is nothing new in the post-hearing evidence that deprives the ALJ's decision of substantial evidence support. Could I answer any questions from the Court? It seems clear in this case that the claimant had variable symptoms from day to day over quite a period of time. It seems to jump out from the record. So assuming that that led to inconsistent reporting of symptoms, a claimant could be completely honest, fairly disabled, yet an ALJ might look at this inconsistent reporting and think, I can't give this person any credibility, because she says something different every time she talks to a doctor. Is that possible in this case, because of the nature of her ailments? Yes, Your Honor, that is possible. That is possible. And that's a problem, frankly. That's a problem with these fibromyalgia cases, and it's a problem with all the cases where the kinds of impairments that a person has wax and wane and cause different And recall that the claim here is that Ms. Vermeulen claims that she was disabled for the whole period from September 2007 on, all the way up through, and presumably continuing, but all the way up through the administrative decision in July of 2013, including the times when she was mowing the lawn, including the times when she was going to work twice a week, stocking shelves, a part-time job, but, you know, an activity that the ALJ cited as, well, seemingly not consistent with her level of limitation. So these are things that, it's problematic, but the ALJ has to weigh them and do the best that they could, and we would respectfully submit that the ALJ's decision is supported by substantial evidence. I see there are no further questions. Thank you, Your Honor. First, let me focus on the two things that the ALJ did not consider and did not discuss, and that is fatigue and impaired concentration. These are documented in the file, well documented in the file, convincing, any specific and convincing reason to reject her testimony about the fatigue she experienced and about the impaired concentration. An example of the impaired concentration, the best example comes from Dr. Bowerly's psychological evaluation in October 2011, in which he didn't come up with any psychological diagnoses, but he found that when he administered the trail-making test, Part B, she scored below the first percentile, which shows that she's got severely impaired concentration. The ALJ does not discuss this. The ALJ does not include any limitation on concentration in his residual functional capacity assessment. So in that regard, the ALJ's RFC, residual functional capacity assessment, is not supported by substantial evidence because he gave no reason not to include any limitations from the impaired concentration. He gave no convincing reason for not including limitations related to the fatigue. He gave no convincing reason for not including limitations relating to her right wrist numbness, which is documented throughout the file. Now, opposing counsel discussed the MRIs. Well, MRIs do not tell us how a person is affected by fibromyalgia. In fact, if you have fibromyalgia, your MRIs are going to be negative. So that does not define what her limits are with regard to the fibromyalgia. He mentioned Dr. Schroeder is a podiatrist. Dr. Schroeder gave an opinion about how her feet were doing, what her limitations were as a result for plantar fasciitis, which the ALJ found was not a severe impairment. But his opinion was he's a podiatrist. He did not give an opinion about fibromyalgia or Sjogren's or concentration problems, any of that. He was just saying her plantar fasciitis does not limit her. Dr. Sapp was an examining physician. He doesn't seem to have examined tender points and doesn't seem to have been knowledgeable about the, you know, he doesn't discuss fatigue, concentration, any of those problems, which are the main problems that the ALJ likewise did not discuss. The state agency non-examiners, they're non-examiners. They are just looking at the record and guessing. And they didn't review the entire file, and they didn't review, their opinions are entitled less way in part, because they didn't review the entire file. You made an argument that the ALJ failed to properly evaluate medical evidence from 15 other medical professionals. And there wasn't really too much explanation about that particular argument. Is the answer simply that all of that is contrary to the weight of the evidence in the case? Or is there something more that we should know about the other medical professionals? Well, she's got so many different problems that she's seen a lot of different doctors. They found a lot of different things wrong with her over time. And the findings in all of those reports are consistent with her testimony about the problem she's having. And they're reasonably consistent with Dr. Nguyen's opinion as well. But the thing is, and it's a problem we will often run into, is none of those doctors were stating, well, I think she can only stand one hour or sit one hour or anything. They didn't give opinions about functional limitations. So we're left having to look at their findings and say, well, are their findings consistent with her testimony? Are their findings consistent with the opinions that we do have? And I guess that's the point of the argument. Thank you, counsel. I want to thank counsel on both sides for your hearty and well-informed advocacy for us. It's really a big help. We appreciate it.
judges: Gould, Ikuta, Tunheim